UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEREK N.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-00737-SEB-MJD |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Claimant Derek N. requests judicial review of the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. See 42 U.S.C. §§ 423(d), 1382. Judge Sarah Evans Barker has designated the undersigned Magistrate Judge to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [Dkt. 14.] For the reasons set forth below, the Magistrate Judge **RECOMMENDS** that the Court **REVERSE** and **REMAND** the decision of the Commissioner.

**I. Background**

Claimant applied for DIB and SSI in October 2019, alleging an onset of disability as of March 31, 2019. [Dkt. 12-5 at 3, 16.] Claimant's applications were denied initially and upon

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

reconsideration, and a hearing was held before Administrative Law Judge Renita K. Bivins ("ALJ") on September 29, 2020. [Dkt. 12-2 at 42.]  On October 15, 2020, ALJ Bivins issued her determination that Claimant was not disabled. *Id.* at 17.  The Appeals Council then denied Claimant's request for review on January 22, 2021. *Id.* at 2.  Claimant timely filed his Complaint on March 26, 2021, seeking judicial review of the ALJ's decision.  [Dkt. 1.]

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423.[2]  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, he is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits his ability to perform basic work activities, he is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform his past relevant work, he is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform his past relevant work, but can perform certain other available work, he is not disabled.  20 C.F.R. § 404.1520.  Before

---

[2] DIB and SSI claims are governed by separate statutes and regulations that are identical in all respects relevant to this case.  For the sake of simplicity, this Entry contains citations to those that apply to DIB.

2

continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

In reviewing Claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019).

An ALJ need not address every piece of evidence but must provide a "logical bridge" between the evidence and her conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether Claimant is disabled. *Id.*

### III. ALJ Decision

The ALJ first determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of March 31, 2019. [Dkt. 12-2 at 19.] At step two, the ALJ found that Claimant had the following severe impairments: "osteoarthritis, bilateral knee chondromalacia, right shoulder rotator cuff tendinopathy, obesity, a depressive/bipolar related disorder, a borderline personality disorder, and a trauma and stressor related disorder." *Id.* At step three, the ALJ found that Claimant's impairments did not meet or equal a listed impairment during the relevant time period. *Id.* at 21. The ALJ then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

3

>to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: able to lift and carry up to 50 pounds occasionally and 25 pounds frequently; able to stand and/or walk for 6 hours per 8-hour day and sit for 6 hours per 8-hour day with normal breaks. Can frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds, frequently stoop, kneel, crouch, and crawl. Frequently reach overhead bilaterally. Able to maintain concentration and attention for completion of simple tasks. Can interact with the public, coworkers, and supervisors on a superficial basis, meaning no customer service duties and working with things rather than people, but allowing necessary interaction to obtain instruction from supervisors with no over-the-shoulder supervision. Can adapt to routine work processes and environments with no high production rate pace and no strict hourly quotas; however, can meet the end of the workday work goals.

*Id.* at 23.

At step four, the ALJ found that Claimant was not able to perform his past relevant work during the relevant time period. *Id*. at 31. At step five, the ALJ, relying on testimony from a vocational expert, determined that Claimant was able to perform jobs that exist in significant numbers in the national economy. *Id*. at 32. Accordingly, the ALJ concluded Claimant was not disabled. *Id.* at 33.

## IV. Discussion

Claimant asserts that the ALJ's decision is erroneous in numerous interconnected ways. Claimant's overarching argument is that the ALJ erred in her assessment of his statements regarding his subjective symptoms by "cherry pick[ing] evidence of 'normal findings and function'" and failing to "provide an accurate and logical bridge from the evidence to her conclusion." [Dkt 15 at 7.] The Court agrees that the ALJ did not adequately support her subjective symptoms evaluation.

With regard to his physical impairments, Claimant testified that, "[s]ince March 2019, on an average day," he experienced bilateral knee pain and right shoulder pain of 5/10 and left shoulder and back pain of 4/10. [Dkt. 12-2 at 59.] He testified that he experienced pain with

bending or stooping and that he was unable to squat. *Id.* at 62. He further testified that the most he could lift was "maybe ten pounds."[3] With regard to his psychological impairments, Claimant testified that he suffers from panic attacks "at least once or twice a day" that each last 20-30 minutes and "feel like I'm having a heart attack and [am] going to die." [Dkt. 12-2 at 67.][4] He further testified that the trigger for a panic attack is "[s]ometimes . . . pretty obvious" but other times "there's no rhyme or reason for it." *Id.* When asked to describe what symptoms caused by his borderline personality disorder would affect his ability to work, Claimant testified:

> Paranoia is one of them. Confrontational sometimes for little to no reason. Oppositionally defiant is a term that has been used. I just don't like—I mean nobody likes to be told what to do, I guess, but it's—I don't know, it creates a feeling like an intense feeling. Stress, I don't handle stress well at all. I'll have severe physical reaction to even small amounts of stress.

*Id.* at 67-68. When asked if he "ever had any difficulty with [his] co-workers, supervisors, or anybody at [his] previous employment," he answered:

> Every, every job I've ever had, I believe I've either quit or I got fired from one or two, but I quit most of them. I got angry over something or other and yeah, there's been lots of problems with that in the past.

*Id.* at 68. He further testified that,

> [o]ther than the physical, the pain things, my worst thing is the anxiety really. Just on a day to day, I have a hard time basically functioning because I'm worried about every silly thing in the world and the real things as well. I just—my anxiety is my worst enemy.

*Id.*

---

[3] If this testimony were fully credited, it clearly would preclude the range of medium work encompassed by the ALJ's RFC.
[4] Given the vocational expert's testimony that being off task even five minutes three times a week outside of normal breaks would preclude employment, *see* [Dkt. 12-2 at 72-73], if Claimant's testimony regarding his panic attacks were fully credited, it appears that it would require finding of disability.

5

Pursuant to Social Security Ruling 16-3p, "[the ALJ] must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *3. Once that is established, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* Social Security Ruling 16-3p, which rescinded Social Security Ruling 96-7p on March 28, 2016, requires that the ALJ assess a claimant's subjective symptoms, but not his credibility. *Id.* at *2. The "change in wording is meant to clarify that [ALJs] aren't in the business of impeaching claimants' character; obviously [ALJs] will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). At stage two of the Social Security Ruling 16-3p analysis, the ALJ considers the claimant's alleged symptoms in light of the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain. 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ acknowledged the requirements of Social Security Ruling 16-3p and, after summarizing Claimant's hearing testimony, concluded with the following ubiquitous boilerplate statement:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely

6

>consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

[Dkt. 12-2 at 25.] The ALJ further concluded that "[t]he claimant's activities and medical records are not consistent with allegations of disabling mental and physical impairments." *Id.* The ALJ then summarized Claimant's medical records at some length. *See id.* at 26-29. However, "[a] summary is not analysis, as it does not explain *why* the evidence summarized undermined Plaintiff's statements about his symptoms or limitations, or which statements were inconsistent." *Michael v. Saul*, 2021 WL 1811736, at *8 (N.D. Ind. May 6, 2021) (emphasis in original) (citing *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008)).

The ALJ's recitation of the medical records regarding Claimant's physical impairments emphasizes various normal findings. For example, the ALJ notes that at a January 2020 visit with his treating orthopedic specialist, Dr. Jill Mikles, Claimant was "noted to be doing well" and that he stated "everything was improving." [Dkt. 12-2 at 26] (citing [Dkt. 12-7 at 462, 464]). That is an accurate statement; it appears that the Supartz injections he had received had resulted in some improvement at that time. However, Claimant returned to Dr. Mikles in June 2020 complaining of bilateral knee pain, reporting "3/4 on pain scale while at rest and 8/10 with activity." [Dkt. 12-7 at 466.] Dr. Mikles gave Claimant steroid injections in both knees as a stopgap while approval was sought from his insurance company for additional Supartz injections. *Id.* at 468.[5] The ALJ further notes three times that Claimant stated that he "was

---

[5] The ALJ's summary of this visit is as follows: "He had 5/5 strength in the lower extremities, normal weight bearing and the only positive provocative test was the medial McMurray sign. He received Supartz injections." [Dkt. 12-2 at 27.] In fact, Claimant did not receive Supartz injections at that visit; he received them at his next visit in September 2020. [Dkt. 12-7 at 470.] The ALJ also notes that, "[i]n June 2020, deep tendon reflexes were normal." *Id.* (citing [Dkt.

doing well" in September 2020. [Dkt. 12-2 at 21, 27] (citing [Dkt. 12-7 at 472]). As the ALJ also notes, however, he still rated his knee pain at 4 out of 10 at that visit. It is clear that "doing well" is relative.[6] See *Szczygiel v. Saul*, 2020 WL 3428032, at *5 (N.D. Ind. June 23, 2020) ("A hopeful statement such as 'doing well' does not necessarily indicate a diagnosis which is inconsistent with claimant's overall findings."); *Kinder v. Berryhill*, 2018 WL 4627226, at * 2. (N.D. Ind. Sept. 26, 2018) (finding that the patient's assessment of doing well or doing okay are meant to be measures of patient's wellness relative to his disease's prognosis not a statement of overall health). It is further unclear how these records are inconsistent with Claimant's testimony that, at the time of the hearing, his knee pain rated 5 out of 10.

In addition, the ALJ notes numerous medical records in which Claimant was noted to have one or more of the following normal findings: (1) "5/5 strength" in various body parts; (2) normal and stable gait; (3) normal neurological examination; (4) normal range of motion; (5) normal coordination and sensation; (6) intact sensation and reflexes; (7) various negative provocative tests; and (8) absence of muscle spasms. [Dkt. 12-2 at 26-27.] However, the ALJ does not explain what, if any, relevance she believes these normal findings have to her evaluation of the subjective symptoms alleged by Claimant. If, for example, the ALJ believes that someone with the type and degree of pain alleged by Claimant would not have normal strength, the ALJ should say so and explain the basis for that belief. As it is, the Court is left to speculate as to what conclusions the ALJ may have drawn from the myriad normal findings cited

---

12-7 at 194]). That finding appears in a note from a June 2020 visit with endocrinologist Kristen Gilbert; it is unclear how that is relevant to the ALJ's subjective symptoms evaluation.
[6] The ALJ also notes this "doing well" comment a fourth time, but improperly attributes it to a September 2019 note, rather than the September 2020 note. See [Dkt. 12-2 at 27] (citing [Dkt. 12-7 at 472]). There is no such comment in the September 2019 note. [Dkt. 12-7 at 445.]

8

in the decision and the basis for those conclusions. The requisite logical bridge is therefore lacking.

The ALJ's consideration of the subjective symptoms relating to Claimant's psychological impairments is similarly flawed. Again, the ALJ points to numerous normal findings noted during Claimant's mental healthcare visits, without explaining how those normal findings conflict with Claimant's assertions regarding his mental health symptoms. *See* [Dkt. 12-2 at 27-29] (noting normal findings such as alert and focused; intact memory; unimpaired judgment;[7] "alert and oriented x 3"; normal speech/language; normal attention and ability to concentrate; organized and appropriately abstract thought processes). The ALJ also noted the following:

- It was noted in May 2019 that his mental status, affect/mood, and judgment/insight were normal. [Dkt. 12-2 at 27] (citing [Dkt. 12-7 at 14] (visit with nurse practitioner for gynecomastia)).

- His psychiatric examination was grossly normal in September and October 2019. *Id.* (citing [Dkt. 12-7 at 39] (new patient consultation at pain clinic) and [Dkt. 12-7 at 49] (visit with endocrinologist for hyperprolactinemia and gynecomastia)).

- In January 2020, his mood and affect were noted to be appropriate. *Id.* at 28 (citing [Dkt. 12-7 at 375] (visit with dermatologist)).

- In June 2020, his mental status, affect, and judgment were grossly normal. *Id.* (citing [Dkt. 12-7 at 287] (visit with endocrinologist for hyperprolactinemia)).

- There was no anxiety or depression noted at examinations in May and June 2020. *Id.* (citing [Dkt. 12-7 at 200] (note from sinus surgery) and [Dkt. 12-7 at 205] (follow-up appointment with surgeon)).

- He had an appropriate mood and affect in May 2020, and he was oriented x 4. *Id.* (citing [Dkt. 12-7 at 382] (visit with dermatologist)).

---

[7] As the ALJ noted, Claimant was noted to have mildly impaired judgment at some visits.

- In July 2020, there was no depression or anxiety. He was oriented to time and place. *Id.* (citing [Dkt. 12-7 at 271] (follow-up after sinus surgery)).

- His mental status was grossly normal in August 2020. *Id.* (citing [Dkt. 12-7 at 174] (note from visit with nurse practitioner at pain clinic)).

Again, it is unclear what the ALJ believes the import of these notations from various healthcare providers is. Given that the ALJ found that Claimant suffered from severe mental impairments, including a "depressive/bipolar related disorder" and a "trauma and stressor related disorder," it does not appear that the ALJ believed that the notations of "no depression or anxiety" or "normal" psychiatric status were accurate. So why mention them? Critically, none of the providers in question were treating Claimant for mental health issues; the notations about Claimant's mental health status are therefore highly unlikely to reflect any actual examination or consideration by the health care provider.[8] *See Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) ("The medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. He is not looking for it, and may not even be competent to diagnose it.") (internal citations omitted);[9] *see also Kylie A. P. v. Kijakazi*, 2022

---

[8] The potential unreliability of these "check box" portions of electronic medical records is underscored by the fact that Claimant's endocrinologist's records cited by the ALJ for its "grossly normal" psychiatric status state that Claimant was "underweight" at his visits, while also recording BMIs of 38.7 and 38.9, which are classified as obese. *See* [Dkt. 12-7 at 284, 286; 291, 294].

[9] Obviously, the notations from the same time periods from Claimant's mental health providers are a more accurate representation of his psychological condition at the time. Those records consistently indicate that Claimant was being treated for anxiety, depression, and other mental health issues and that he suffered symptoms caused by them. *See, e.g.*, [Dkt. 12-7 at 83] (July 2019 visit, noting severe anxiety and moderate depression and discussing symptoms at length); [Dkt. 12-7 at 77] (note from October 2019 visit at which Claimant "rate[d] anxiety 9-10 and scored 17 on the GAD-7 indicating severe anxiety" and rated[d] depression at 7 and scored 14 on the PHQ-9 indicating moderate depression"); [Dkt. 12-7 at 94] (November 2019 visit noting

WL 1043871, at *5 (N.D. Ind. Apr. 7, 2022) ("Considering [the claimant] was receiving regular treatment from mental health providers throughout the medical record, the ALJ's reliance on physical examinations to support mental health symptoms and findings was in error."). Again, it is unclear how the ALJ believed the notations in question were relevant to her assessment of Claimant's subjective symptoms, but it is clear that it was error for her to include them as a basis for that assessment without building the requisite logical bridge between them and her conclusion.

     A bit later in her decision, the ALJ stated that "claimant's testimony is not entirely consistent with the medical evidence." The ALJ again notes various normal findings in Claimant's mental health records, without explaining how those records are inconsistent with Claimant's testimony and without recognizing that many of them are from healthcare providers who saw Claimant for physical conditions, not mental health treatment. Perplexingly, the ALJ notes six times that Claimant's medical records state that Claimant is able to read and write and that he "learn[s] best by seeing, hearing and doing." *See* [Dkt. 12-2 at 29, 30, 31]. It is entirely unclear how those unremarkable facts call the veracity of Claimant's testimony into question; he did not claim to be illiterate or wholly unable to learn. The ALJ also states, twice, that "[n]otably, there is no report or mention of general distrust of others, belief of conspiracies or suspicions of others." [Dkt. 12-2 at 29, 30.] Since the ALJ does not specifically refer to any particular records when making this statement, the Court assumes she is referring to **all** of Claimant's medical records. If so, that statement is incorrect; in fact, there is at least one such

---

Claimant became angry during visit and that he reported constant anxiety and "panics every day over and over again"); [Dkt. 12-7 at 418] (June 2020 visit reporting 7/10 anxiety level).

11

mention in Claimant's mental health records. *See* [Dkt. 12-7 at 75] ("He reports he doesn't like to be around people and has trouble going to the store. He reports he feels like people are watching him. . . . He reports he can't stand to be alone . . . is paranoid and suspicious . . . is quickly disillusioned with someone being his best friend one minute and not liking them the next.").

Finally, the ALJ notes that Claimant "came alone" to a June 2020 mental health appointment. See [Dkt. 12-2 at 30.] Although the ALJ does not say why she believes this is inconsistent with Claimant's statements, presumably it is because Claimant's testimony and Function Report suggest that he finds it difficult to go places by himself because of his anxiety. However, the Court notes that the June 2020 appointment cited by the ALJ was quite clearly a **telemed visit** due to COVID-19, so it did not require Claimant to leave his house. *See* [Dkt. 12-7 at 418.]

In addition to finding Claimant's testimony inconsistent with the medical evidence, the ALJ noted several examples of what she termed "consistency issues in the file." [Dkt. 12-2 at 29.] First, she stated: "Notably, the claimant has past work as a chef and a line cook and he testified that his hobby was cooking; yet, he also testified that the [sic] due to his concentration, the night before the hearing he put the box in the oven instead of the pizza." *Id.* It is true that when asked if he had any hobbies, Claimant answered "I like to play video games and I like to cook." [Dkt. 12-2 at 60.] However, when asked what type of foods he cooks, he answered "[i]t's simple things usually anymore. It's frozen foods. Something that's just a step or two to prepare. And I have the knowledge to do more. I just—I don't have the—either a desire or the ability to stand and do it all." *Id.* at 64. Thus, the entirety of his testimony about cooking does not suggest that he is able to engage in cooking that requires sustained concentration and is not inconsistent

with his anecdote about putting the box from a frozen pizza in the oven by mistake. His

Function Report is similarly consistent with regard to cooking:

> 12. **MEALS**
> a. Do you prepare your own meals?  ☒ Yes  ☒ No
> If "Yes," what kind of food do you prepare? (For example, sandwiches, frozen dinners, or complete meals with several courses). *If I'm having a good day I can make a full meal, I used to be a chef, other days frozen stuff is alot.*
>
> How often do you prepare food or meals? (For example, daily, weekly, monthly.) *1-2 times a week*
>
> How long does it take you? *Several hours if its a real meal*
> Any changes in cooking habits since the illness, injuries, or conditions began? *I used to cook all the time and very complicated stuff.*
>
> b. If "No," explain why you cannot or do not prepare meals. *It hurts to stand that long and I just have no appetite anymore.*

[Dkt. 12-6 at 31.]

Next, the ALJ noted:

> The claimant testified to significant paranoia; yet, his testimony suggests he has the ability to regularly attend numerous doctors' appointments. It is reasonable that the claimant encounters others in the parking lot, lobby, waiting areas, and other public areas. Further, the claimant testified to eating out since his alleged onset date, although he testified that he senses people are watching him in judging how he eats. The claimant testified that he goes grocery shopping with his girlfriend, and that he has no car because his car was repossessed and before that his wife took him.

[Dkt. 12-2 at 29.] It is unclear what inconsistency the ALJ finds here. Claimant did not testify

that he is unable to leave his home because of his paranoia, but rather that he "get[s] really

anxious around even small groups of people." [Dkt. 12-2 at 63.] And while he answered in the

affirmative when asked if he had been out to eat since March 2019, his alleged onset date, he

further testified that he has "quite a lot" of difficulty going out to eat because "I feel like people

13

are watching me and watching me eat and how I'm doing it and judging me on that.  I don't enjoy it anymore." *Id.*  Claimant's function report adds further context:



[Dkt. 12-6 at 32.]

The Seventh Circuit has regularly cautioned that "[a]n ALJ cannot disregard a claimant's limitations in performing household activities," and it was error for the ALJ to do so here. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *see also Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (finding that it was error for ALJ not to mention "[u]ncontested evidence [that] reveal[ed] that [the claimant] perform[ed] [her] chores with difficulty, and with the aid of her sister, a neighbor, and another woman."); *cf. Thompson v. Berryhill*, 722 F. App'x 573, 580 (7th Cir. 2018) (error for ALJ to highlight fact that claimant "shop[ped] for food weekly" despite her panic disorder with agoraphobia, while "skip[ping] over the fact that she spent only *30 minutes*

14

shopping in a week") (emphasis in original).  Perhaps the ALJ did not believe Claimant's statements regarding his limitations in performing the activities at issue, or perhaps the ALJ was unaware of those statements.  The Court has no way of knowing, since the ALJ did not acknowledge them.

Finally, the ALJ noted the following inconsistency:

> The claimant testified that he smokes and doctors have advised him to quit because it affects his conditions, but did not talk to him about the effect on his pain.  Contrary to the claimant's testimony, in November 2019, Dr. Mikles discussed tobacco cessation to help inflammation and pain.

[Dkt. 12-2 at 29] (citing [Dkt. 12-7 at 458]).  It is true that, when asked at the hearing whether his doctors had "advised [him] on the effects of smoking on [his] condition" and told him "about the effects of smoking on pain," Claimant answered no, but noted that they had "talked to [him] about quitting."  [Dkt. 12-2 at 60.]  It is also true that the doctor's note cited by the ALJ states: "We also discussed tobacco cessation to help inflammation and pain."  [Dkt. 12-7 at 458.]  Once again, it is unclear what the ALJ believes the import of this inconsistency is, however.  Does the ALJ believe she caught the Claimant in a lie and therefore none of Claimant's testimony should be credited?  If so, did the ALJ consider the fact that the doctor's note most likely reflects a brief conversation that took place ten months earlier at one of Claimant's many medical appointments, and perhaps Claimant—whom the ALJ found had a mild limitation in understanding, remembering or applying information and a moderate limitation in concentration and interacting with others—simply did not remember it?  Again, the Court does not know, because the ALJ does not say.

The Commissioner argues that the ALJ need only "'minimally articulate reasons for crediting or rejecting evidence of disability'" and that "the ALJ's evaluation need not be

15

'flawless' to withstand review." [Dkt. 16 at 30] (quoting *Scivally v. Sullivan*, 9[6]6 F.2d 1070, 1076 (7th Cir. 1992), and *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009)).  However, the Seventh Circuit regularly reverses decisions where the ALJ's subjective symptoms evaluation (or, previously, credibility determination) is inadequately explained or based on a mischaracterization of the record.  *See, e.g.*, *Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (reversing, in part, because the ALJ "cited irrelevant records from treatment [the claimant] received for a staph infection and she noted that his extremities were not fractured, tender, or swollen" but "[t]he connection between those characteristics and [the claimant's] alleged pain and restricted mobility is nowhere explained"); *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (reversing, in part, because "[]the ALJ did not really explain, for example, why he did not believe [the claimant's] testimony that he could not walk more than a very short distance and had to lie down several times during the day to manage his pain—testimony which, if believed, would preclude competitive employment according to the vocational expert"); *Perkins v. Astrue,* 498 F. App'x 641, 644 (7th Cir. 2013) (reversing, in part, because "the ALJ only briefly mentioned [the claimant's] dishonesty about his drug abuse, without explaining whether or how much this undermined [his] credibility" and "the ALJ noted [the claimant's] comment to a nurse that he walks a mile daily, but the ALJ again did not explain how his ability to walk one mile is inconsistent with the limitations that he claimed, or consistent with standing or walking for 6 hours of an 8–hour workday); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence.") (citations omitted).  Thus, regardless of the deferential standard, an ALJ is required to provide an actual

explanation for her subjective symptom assessment that is based on the evidence of record. The failure to do so is, and has always been, error.

As the Court has now discussed at great length, the ALJ failed to adequately explain and support her assessment of Claimant's subjective symptoms. Remand is required to correct this error. Because all of the other errors asserted by Claimant flow from or are impacted by this error, the Court need not address in detail each of the other asserted errors. Suffice it to say that, once the ALJ has reassessed her subjective symptoms evaluation, she must revaluate her determination regarding Listing 12.00 and her RFC determination in light of the reassessment, and shall take care that all of Claimant's mental and physical limitations are accounted for in the RFC.[10] On remand, the ALJ must also address Claimant's diagnosis of chronic pain syndrome and reassess the weight to be given to the statement of Plaintiff's former wife, taking care not to

---

[10] The Commissioner suggests that the ALJ's RFC determination is supported by substantial evidence because there is no medical opinion in the record that establishes greater limitations than those found by the ALJ. The Seventh Circuit has rejected that argument, however, in the context of an unsupported credibility determination:

> It might be argued that these mistakes in evaluating Hill's credibility were harmless. As the Commissioner points out, no doctor has opined that Hill has more limitations than the ALJ incorporated into her assessment of Hill's residual functional capacity. But Hill *testified* that she is more limited, and her testimony cannot be disregarded simply because it is not corroborated by objective medical evidence. *See Hall v. Colvin,* 778 F.3d 688, 691 (7th Cir. 2015); *Pierce v. Colvin,* 739 F.3d 1046, 1049-50 (7th Cir. 2014); *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006). We are not confident that the ALJ would have reached the same conclusion about Hill's credibility had she not inappropriately "played doctor," ignored possible explanations for Hill's conservative treatment, and conflated a desire to work with the ability to do so. So the ALJ's errors are not harmless.

*Hill v. Colvin,* 807 F.3d 862, 869 (7th Cir. 2015) (emphasis in original) (additional citations omitted). So too, here, the Court cannot conclude that the ALJ would have reached the same conclusion about Claimant's RFC absent the errors in her subjective symptom evaluation.

17

base that assessment on cherry-picked statements from the medical records or a conflation of "stable" mental health conditions with "non-disabling" mental health conditions.[11]  See *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), *as amended* (Aug. 20, 2014) ("Simply because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of doing light work.").  Finally, if necessary, the ALJ shall obtain updated opinions from the state agency medical and psychological consultants.

## V. Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and **REMANDED for further proceedings consistent with this Report and Recommendation**.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

SO ORDERED.

Dated: 27 APR 2022

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

---

[11] The ALJ found the statement of Claimant's former wife to have "limited persuasion," based in part on the improperly selective recitation of "normal" findings discussed at length above and on the fact that "[t]reatment providers concluded the claimant's mental health conditions are stable." [Dkt. 12-2 at 30.]

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.